CLEARY, Chief Judge
In 2000, when James Robinson Poole finished serving a prison sentence for convictions for criminal sexual conduct, he was indeterminately committed to the Minnesota Sex Offender Program (MSOP) as a sexually dangerous person (SDP) and as a sexual psychopathic personality (SPP). In 2017, Poole petitioned for a complete discharge from MSOP. At a first-phase hearing on Poole's petition, the Judicial Appeal Panel admitted the testimony and report of its own examiner. At the end of the first-phase hearing, the commissioner of human services moved the panel, under Minn. R. Civ. P. 41.02(b), to dismiss Poole's petition, asserting that *64 Poole failed to make a prima facie case for discharge. The panel granted the commissioner's motion. Poole appeals, arguing that (a) at the first-phase hearing, the panel should not have admitted, and should not have considered, the testimony and report of the panel's examiner; (b) the panel should not have granted the county's motion to dismiss Poole's petition; and (c) the discharge criteria in Minn. Stat. § 253D.31 (2016) deprive committed persons of due process of law because they allow continued commitment when a person's confinement no longer bears a reasonable relationship to the reason for the commitment. We conclude that the panel erred when it considered the testimony and report of its examiner. We affirm the panel, however, because, even if the testimony and report of the panel's examiner are disregarded, Poole still did not make a prima facie case for discharge, and because Minn. Stat. § 253D.31 does not unconstitutionally allow continued commitment when a person's confinement no longer bears a reasonable relationship to the reason for the commitment because of alleged unamenability to treatment.
FACTS
Poole was licensed to practice medicine in 1968. As a result of misconduct in his examinations of certain female patients, a jury convicted Poole of 16 counts of third- and fourth-degree criminal sexual conduct. The conduct for which Poole was convicted did not include penile penetration of any victim. State v. Poole , 499 N.W.2d 31, 32-33 (Minn. 1993) (describing Poole's offenses). After Poole served his sentence, he was indeterminately committed to MSOP. In re Poole , No. C4-00-85, 2000 WL 781381, at *1 (Minn. App. June 20, 2000). In 2009, Poole stopped participating in sex offender treatment in MSOP. In January 2017, Poole petitioned the Special Review Board (SRB) for a transfer to community preparation services, a provisional discharge from MSOP, or a full discharge from MSOP. After a hearing, the SRB issued its findings of fact and recommendation to deny Poole's requests. Poole petitioned for rehearing and reconsideration, and a first-phase hearing on that petition occurred before the appeal panel.
At the start of the first-phase hearing, Poole withdrew all of his requests for relief except his request for a full discharge from MSOP. Additionally, in support of his petition, Poole submitted, and the panel admitted, the report of Dr. Jennifer Jones, among other exhibits. Poole then testified in support of his discharge, asserting that his MSOP polygraph results showed that he was nondeceptive[1] , that he would be age 80 in September 2018, and that he has poor balance and uses a cane. Poole also testified that surgery for prostatecancer five years earlier left him with "a leaky bladder, bladder incontinence, and ... completely sexually impotent[,]" and that his cancer is currently in remission. Poole noted that he has no history of substance abuse, and asserted that, if released, he could live on his Social Security income with family or friends in Montana or California or Sweden. He further asserted that he has no intention of attempting to regain his license to practice medicine, that he needs neither sex offender treatment nor treatment for a lack of concern for other people, that he "no longer [has] any interest in sex whatsoever," and that he "absolutely [will] not" engage in sex offender treatment if he is discharged. Poole admitted that he was removed from sex offender treatment in prison, has not engaged in sex offender treatment outside of prison and MSOP, and has never completed a sex *65 offender treatment program. Further, he denied "most" of the allegations that he committed uncharged sex offenses against extended family members, and noted that he has been incarcerated or in MSOP since 1991.
The panel then called the examiner appointed by the panel, Dr. Mary Kenning. During her testimony, her report was admitted. Both her testimony and her report were unfavorable to Poole's requested discharge. At the conclusion of her testimony, the commissioner moved to dismiss Poole's petition for discharge, and, after hearing arguments on the point, the panel took the matter under advisement.
The panel's resulting March 26, 2018 order recited the procedural and factual history of the matter and detailed the testimony and report of the panel's examiner, as well as the report of Dr. Jones. After describing Poole's testimony, the order analyzed the legal standard for discharge, and ruled that "[Poole] has failed to establish a prima facie case that he is entitled to a discharge from his civil commitment." The panel granted the commissioner's motion to dismiss Poole's petition for discharge, and denied Poole's petition for discharge. Poole appeals.
ISSUES
I. Did the appeal panel err, at the first-phase hearing, by calling its own examiner and admitting her report into evidence?
II. Did the appeal panel err in ruling that Poole failed to make a prima facie case that he is not a danger to the public?
III. Do the criteria for discharge from MSOP unconstitutionally permit confinement after the confinement lacks a reasonable relationship to the purpose of the commitment?
ANALYSIS
Matters involving SDPs and SPPs are governed by Minnesota Statutes chapter 253D. Under that chapter, a committed person
seeking discharge or provisional discharge bears the burden of going forward with the evidence, which means presenting a prima facie case with competent evidence to show that the person is entitled to the requested relief. If the petitioning party has met this burden, the party opposing discharge or provisional discharge bears the burden of proof by clear and convincing evidence that the discharge or provisional discharge should be denied.
Minn. Stat. § 253D.28, subd. 2(d) (2016). Regarding petitions for full or partial discharge from MSOP, the supreme court has stated:
When appearing before [the panel], the committed person bears the burden of going forward with the evidence, which means presenting a prima facie case with competent evidence to show that the person is entitled to the requested relief. We have recently described that burden as a burden of production, which requires the committed person to come forward with sufficient, competent evidence that, if proven, would entitle the petitioner to relief. The proceeding in which a committed person produces evidence is commonly referred to as a first-phase hearing. If the committed person satisfies his burden of production, then the party opposing the petition bears the burden of proof by clear and convincing evidence that the discharge or provisional discharge should be denied. The proceeding in which the opposing party attempts to prove that the discharge petition should be denied is commonly referred to as a second-phase hearing.
*66 Coker v. Jesson , 831 N.W.2d 483, 485-86 (Minn. 2013) (quotations, citations, and footnote omitted); see Minn. Stat. § 253D.28, subd. 2(d) (2016) (addressing discharge).
I.
Poole asserts that, at a first-phase hearing, the panel should not have called its examiner as a witness, and should not have admitted her report into evidence. The Commitment and Treatment Act Rules (the Special Rules) "apply in proceedings" under chapter 253D, and "supersede any other body of rules otherwise applicable (e.g., the Rules of Civil Procedure for the District Courts, Probate Court Rules, etc.) in conflict with these Special Rules." Minn. Spec. R. Commit. & Treat. Act 1(a), (b) (respectively). Construction of rules, as well as the construction of chapter 253D and associated caselaw, is addressed de novo. Coker , 831 N.W.2d at 489 (rules); In re Civil Commitment of Lonergan , 811 N.W.2d 635, 639 (Minn. 2012) (statutes); In re Guardianship of Welch , 686 N.W.2d 54, 56 (Minn. App. 2004) (caselaw).
Special Rule 15, titled "Evidence," states: "The court may admit all relevant, reliable evidence, including but not limited to the respondent's medical records, without requiring foundation witnesses." Similarly, Minn. Stat. § 253D.28 (2016), titled "JUDICIAL APPEAL PANEL," allows the panel to appoint examiners, and states that the panel "shall hear and receive all relevant testimony and evidence." Minn. Stat. § 253D.28, subd. 2(c). The question at a first-phase hearing is whether the committed person produces competent evidence which, if proven, would entitle the committed person to the relief sought. Coker , 831 N.W.2d at 485-86. The testimony and reports of a witness called by the panel are not evidence produced by the committed person. Therefore, the panel should not have called its own examiner and should not have admitted her report at Poole's first-phase hearing.
II.
To obtain a discharge from MSOP, a person committed as SDP "or" SPP must show "that [he] is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision." Minn. Stat. § 253D.31 (2016).[2] Construing a predecessor to this statute, the supreme court ruled that a person can remain confined "for only so long as he or she continues both to need further inpatient treatment and supervision for his sexual disorder and to pose a danger to the public." Call v. Gomez , 535 N.W.2d 312, 319 (Minn. 1995)[3] ; see In re Commitment of Fugelseth , 907 N.W.2d 248, 253 (Minn. App. 2018) (applying Call ), review denied (Minn. Apr. 17, 2018). Poole challenges the dismissal of his petition, arguing that "he cannot be constitutionally confined" if he "is no longer dangerous or does not require treatment for a mental illness," and that he made a prima facie case that he is no longer dangerous to the public. When a panel assesses whether the committed person made a prima facie case, the panel "may not weigh the evidence or make credibility determinations,"
*67 and must "view the evidence produced at the first-phase hearing in a light most favorable to the committed person." Coker , 831 N.W.2d at 490-91. Appellate courts "review the judicial appeal panel's dismissal of the petition for discharge de novo." Foster v. Jesson , 857 N.W.2d 545, 549 (Minn. App. 2014) (citation omitted); see Larson v. Jesson , 847 N.W.2d 531, 534 (Minn. App. 2014) (same).
A. Harmless error
Finding 61 in the panel's order quotes the report of the panel's examiner, and states in part:
The panel is not convinced that [Poole] does not pose a danger to the public. Although various assessments indicate a low risk of recidivism, [the panel's examiner] opined that [Poole] possesses "unique risk factors" [which] are "likely to motivate him to behave in ways he has in the past although his sexual appetite may not be as strong." Additionally, since [Poole] has "no belief that his past abusive behavior was wrong" and "no insight into this process, [that] removes another barrier to [his] reoffending."
We read the panel's conclusion that it was not "convinced" that Poole did not pose a danger to the public to be based, at least in part, on its balancing of the evidence from its examiner against Poole's evidence. This is contrary to Coker . 831 N.W.2d at 490-91.
Any such error, however, is not necessarily fatal to a panel's determination regarding whether a committed person made a prima facie case for the relief sought. In Coker , when a committed person sought a provisional discharge and the panel allowed the commissioner (who opposed the provisional discharge) to submit exhibits, the supreme court stated that the panel's admission of those exhibits at the first-phase hearing
unnecessarily complicated the analysis of the Commissioner's subsequent motion to dismiss under Minn. R. Civ. P. 41.02(b). More specifically, the submission of competing facts by an adverse party makes the application of the "viewed in a light most favorable to the committed person" standard more difficult to apply. Consequently, the better practice would be to wait until the second-phase hearing before receiving the exhibits, testimony, and other evidence offered by the Commissioner.
Id. at 491 n.9. The supreme court went on to say that "[w]hile dismissal under Minn. R. Civ. P. 41.02(b) might be appropriate when the committed person does not meet his burden of production, in this case Coker met his burden of production." Id. at 491. Thus, the admission, at the first-phase hearing in Coker , of evidence submitted by a party adverse to the committed person, made application of the relevant standard "more difficult to apply" but it did not preclude the supreme court from determining that the committed person actually met his burden of production. Id. at 491 n.9. Therefore, we conclude that a harmless-error analysis applies to a panel's receipt and consideration of evidence that should not be considered in assessing whether, at a first-phase hearing, the committed person made a prima facie case for the relief sought. See In re Gonzalez , 456 N.W.2d 724, 728 (Minn. App. 1990) (noting, in an appeal from a commitment as mentally ill, that "the error [by the district court], if any, was harmless"); In re Picataci , 367 N.W.2d 609, 613 (Minn. App. 1985) (making a similar statement).
B. Prima facie case
To support his assertion that he is no longer a danger to the public, Poole offered, and the panel accepted, Dr. Jones's report. Dr. Jones's report is an extensive *68 "Sexual Violence Risk Assessment." The report addresses Poole's history, the results of Dr. Jones's interview of Poole, and Poole's results on various risk assessments. The risk assessments suggest Poole has a limited probability of reoffending. After reciting this background information, the report addresses a possible discharge of Poole, stating (a) "[Poole] is essentially an untreated sexual offender, as despite incarceration and subsequent commitment for his sexual offending he has minimally participated in treatment[;]" (b) Poole stopped participating in treatment in March 2009, and "[i]t does not appear [Poole] has reengaged in treatment since that time, which suggests minimal intervention [in his] cognitive distortions supporting of [his] sexual offending[;]" (c) Poole's "ingrained beliefs with respect to sexually problematic behaviors and lack of evidence suggestive of treatment participation and change [make it] reasonable to surmise [that Poole's beliefs] have sustained[;]" (d) "[Poole] has not demonstrated clinical progress suggestive of readiness for reduction in supervision or treatment need[;]" (e) Poole's assertion that his health-apparently referring to his alleged impotence-shows that he is not a danger is unpersuasive because Poole "did not necessarily require sexual functioning in order to sexually offend[;]" and (f) Poole "has remaining treatment needs with respect to his paraphilic disorder and as such remains a danger to the public." Dr. Jones's discussion of Poole's request for discharge culminates by stating:
Poole continues to require institutionalization in order to provide for his remaining needs and public protection. His current placement at the MSOP is the most appropriate and he cannot be transferred to a less secure facility while providing the public safety criterion . Mr. Poole does not meet criteria for a transfer, provisional, or full discharge from his commitment at this time.
(Emphasis added).
Despite the fact that Dr. Jones unambiguously states (multiple times) that Poole remains a danger to the public, Poole submitted Dr. Jones's report to support his assertion that he is not a danger to the public. Poole's argument that he made a prima facie case that he is not a danger to the public is supported only by his own interpretation of the results of the risk assessments, which suggest he has a limited probability of reoffending. Because the crux of Poole's claim that he is not a danger to the public is his own otherwise unsupported reading of those assessments and is contrary to his own expert's reading of those assessments, his argument is that his own otherwise-uncorroborated assertions entitle him to a second-phase (evidentiary) hearing. If we accepted this assertion, a first-phase hearing would devolve into committed persons reciting conclusory and formulaic testimony regarding the threshold for obtaining a second-phase hearing-essentially committed persons uttering magic words. Generally, courts have ruled that mere conclusory assertions are insufficient to avoid an adverse ruling. See, e.g. , Cole v. Wutzke , 884 N.W.2d 634, 638 (Minn. 2016) (reopening judgments under Minn. R. Civ. P. 60.02 ); Rossberg v. State , 874 N.W.2d 786, 791 (Minn. 2016) (postconviction relief); Andersen v. State , 830 N.W.2d 1, 12 (Minn. 2013) (obtaining an evidentiary hearing in criminal matters after waiving the right to testify); Dyrdal v. Golden Nuggets, Inc., 689 N.W.2d 779, 783 (Minn. 2004) (summary judgment); In re Rahr Malting Co. , 632 N.W.2d 572, 576 (Minn. 2001) (whether something is a trade secret); In re Welfare of L.L.P. , 836 N.W.2d 563, 571 (Minn. App. 2013) (adoptive placement); Szarzynski v. Szarzynski , 732 N.W.2d 285, 292 (Minn. App. 2007)
*69 (modification of custody); Sanderson v. State , 601 N.W.2d 219, 226 (Minn. App. 1999) (ineffective assistance of counsel). Consistent with these cases, we decline to rule that, by themselves, conclusory assertions by a committed person are sufficient to avoid dismissal of a petition for discharge from MSOP. Here, Poole's own submissions include multiple statements that he remains a danger to the public and these submissions lack evidence, other than Poole's own statements, to the contrary. On this record, even considering the obligation to view the record in the light most favorable to Poole, we decline to rule that Poole's otherwise uncorroborated assertions regarding the risk he poses to the public are sufficient to establish a prima facie case that he is not a danger to the public, especially when those assertions are contrary to those of his own expert. Therefore, we affirm the panel's determination that Poole did not establish a prima facie case on this point.
III.
Under the version of Minn. Stat. § 253D.31 applicable to this case:
A person who is committed as a sexually dangerous person or a person with a sexual psychopathic personality shall not be discharged unless it appears to the satisfaction of the judicial appeal panel, after a hearing and recommendation by a majority of the special review board, that the committed person is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision.
In determining whether a discharge shall be recommended, the special review board and judicial appeal panel shall consider whether specific conditions exist to provide a reasonable degree of protection to the public and to assist the committed person in adjusting to the community. If the desired conditions do not exist, the discharge shall not be granted.
Call construed a predecessor to this statute that was similar to the current statute, and did so in light of "the basic constitutional requirement that 'the nature of commitment bear some reasonable relation to the purpose for which the individual [was originally] committed.' " Call , 535 N.W.2d at 318 (quoting Foucha v. Louisiana , 504 U.S. 71, 79, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992) ). Call states that a patient committed as a psychopathic personality[4] may be confined as long as "the person continues to need treatment for his sexual disorder and continues to pose a danger to the public[.]" Call , 535 N.W.2d at 319. Focusing on the continued-need-for-treatment prong of the Call standard, and asserting that some persons are (allegedly) unamenable to treatment, Poole argues that the discharge criteria deprive committed persons of due process of law because they "permit continued confinement even after said confinement no longer bears a reasonable relationship to the purpose of the person's commitment."
Regarding constitutional challenges to statutes, the supreme court has stated:
The constitutionality of a statute is a question of law that [appellate courts] review de novo. [An appellate court's] power to declare a law unconstitutional is to be exercised only when absolutely necessary in the particular case and then with great caution ... [and appellate *70 courts] will uphold a statute unless the challenging party demonstrates that it is unconstitutional beyond a reasonable doubt.
SooHoo v. Johnson , 731 N.W.2d 815, 821 (Minn. 2007) (citations and internal quotation marks omitted).
The supreme court has upheld the constitutionality of the SDP statute and the predecessor to the SPP statute. See In re Linehan, 594 N.W.2d 867 (Minn. 1999) (SDP); In re Blodgett, 510 N.W.2d 910 (Minn. 1994) (psychopathic personality statute). "[W]hen the [Minnesota] [S]upreme [C]ourt has already construed a statute, this court is bound by that interpretation." State v. Rohan , 834 N.W.2d 223, 227 (Minn. App. 2013), review denied (Minn. Oct. 15, 2013); see State v. Final Exit Network, Inc. , 889 N.W.2d 296, 303 (Minn. App. 2016) (stating that this court "[is] bound by Minnesota Supreme Court precedent"), review denied (Minn. Mar. 14, 2017), cert. denied , --- U.S. ----, 138 S.Ct. 145, 199 L.Ed.2d 36 (2017). Under these circumstances, we cannot conclude that the discharge criteria in Minn. Stat. § 253D.31, as construed in Call , are unconstitutional.
Nor is Poole's argument otherwise persuasive. The Eighth Circuit Court of Appeals rejected an assertion that the Minnesota Civil Commitment and Treatment Act is facially unconstitutional because it deprives patients of substantive due process by allowing patients to be confined even when that confinement no longer bears a reasonable relationship to the purpose of that confinement. In doing so, the court described the statutory process for a patient to seek a discharge or reduction in custody, and then stated:
We conclude that this extensive process and the protections to persons committed under MCTA are rationally related to the State's legitimate interest of protecting its citizens from sexually dangerous persons or persons who have a sexual psychopathic personality. Those protections allow committed individuals to petition for a reduction in custody, including release; therefore, the statute is facially constitutional.
Karsjens v. Piper , 845 F.3d 394, 410 (8th Cir. 2017). And the U.S. Supreme Court has stated that it has "never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." Kansas v. Hendricks , 521 U.S. 346, 366, 117 S.Ct. 2072, 2084, 138 L.Ed.2d 501 (1997) ; see Call , 535 N.W.2d at 318 (stating that "[i]n [ In re Blodgett , 510 N.W.2d 910, 916 (Minn. 1994) ], we rejected the argument that a psychopathic personality condition is untreatable, and, therefore, confinement is equivalent to life-long preventive detention") (quotations omitted). Thus, we conclude that alleged unamenability to treatment, by itself, does not entitle an MSOP patient to release from confinement.
DECISION
At the first-phase hearing on Poole's petition for discharge from the Minnesota Sex Offender Program, the judicial appeal panel erred by calling its own examiner and considering evidence submitted by that witness. On this record, however, that error was harmless. Even ignoring the evidence from the panel's examiner and viewing the remainder of the record in the light most favorable to Poole, we conclude that Poole failed to make a prima facie case that he is not a danger to the public; some of his own evidence indicates that he remains a danger to the public, and his conclusory assertions to the contrary are unsupported. Finally, Poole has not shown that the criteria in Minn. Stat. § 253D.31 for discharge from the Minnesota *71 Sex Offender Program, as construed in Call v. Gomez , 535 N.W.2d 312, 319 (Minn. 1995), are unconstitutional.
Affirmed.

Poole's polygraph was apparently administered in 2004.

We note that, effective May 30, 2018, the word "inpatient" was removed from Minn. Stat. § 253D.31 (2016). 2018 Minn. Laws ch. 194 § 2.

The discharge criteria in the statute at issue in Call "require[d] a showing that the person is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision. Minn. Stat. § 253B.18, subd. 15." 535 N.W.2d at 319.

The "psychopathic personality" classification at issue in Call is similar to the current "sexual psychopathic personality" classification. See Call , 535 N.W.2d at 317 & n.2 (addressing evolution of the former "psychopathic personality" to the current "sexual psychopathic personality").